FILED

2023 Mar-16  PM 12:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

JASON HIGHTSHOE,        )
       )
       Plaintiff,        )
       )
       vs.        )  Case No.  4:21-cv-00817-HNJ
       )
SOCIAL SECURITYADMINISTRATION, )
COMMISSIONER,        )
       )
       Defendant.        )

## MEMORANDUM OPINION

Plaintiff Jason Hightshoe seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability, disability insurance, and supplemental security income benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.  (Doc. 13).

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at §§ 404.1520(c), 416.920(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at §§ 404.1520(d), 416.920(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§

404.1520(a)(4)(iii), 404.1525, 416.920(a)(4)(iii), 416.925.  That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3), 404.1520(g), 416.920(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* §§

404.1520(a)(4)(v), 416.920(a)(4)(v); *see also* 20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 416.920(a)(4)(v), 416.920(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. . . .  Substantial evidence . . . . is 'more than a mere scintilla,' . . . [and] means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted).  Therefore, substantial evidence exists even if the evidence

preponderates against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Hightshoe, age 45 on the date of the administrative hearing, filed applications for a period of disability, disability insurance, and supplemental security income benefits on May 10, 2019, alleging disability as of August 31, 2017.  (Tr. 78, 216-228).  On August 8, 2019, the Commissioner denied Hightshoe's administrative claim, and on September 13, 2029, Hightshoe timely filed a request for a hearing.  (Tr. 153-156).   An Administrative Law Judge ("ALJ") held a hearing on September 28, 2020, (Tr. 78), and he issued an opinion on November 30, 2020, denying Hightshoe's claim, (Tr. 12-25).

Applying the five-step sequential process, the ALJ found at step one that Hightshoe did not engage in substantial gainful activity since August 31, 2017, the alleged onset date.  (Tr. 80).  At step two, the ALJ found Hightshoe manifested the severe impairments of depression, anxiety, hypertension, cervical degenerative disc disease, and status post comminuted distal tibia fracture.  (Tr. 81).  At step three, the ALJ found that Hightshoe's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.*).

Next, the ALJ found Hightshoe exhibited the residual functional capacity ("RFC")

to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant must avoid climbing ladders, ropes, and scaffolds. The claimant must avoid hazardous machinery, unprotected heights, and open bodies of water. He can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. The claimant can frequently balance. He can have occasional exposure to extreme temperatures, wetness, and pulmonary irritants in the work environment. The claimant can understand, remember, and carry out simple instructions. He can have occasional contact with coworkers, supervisors, and the public. If afforded midmorning, lunch, and midafternoon breaks, the claimant can complete these tasks for two hours periods over the course of an eight-hour day.

(Tr. 83).

At step four, the ALJ determined Hightshoe could not perform his past relevant work as a cook. (Tr. 87). At step five, the ALJ determined Hightshow could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC. (Tr. 88). Accordingly, the ALJ determined Hightshow has not suffered a disability, as defined by the Social Security Act, since August 31, 2017. (Tr. 89).

Hightshoe timely requested review of the ALJ's decision. (Tr. 213-215). On May 18, 2021, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision. (Tr. 1-4). On June 17, 2021, Hightshoe filed his complaint with the court seeking review of the ALJ's decision. (Doc. 1).

## ANALYSIS

In this appeal, Hightshoe argues that the ALJ's residual functional capacity finding lacks substantial evidentiary support, the ALJ's finding conflicts with the

Commissioner's medical expert and his own testimony, the ALJ improperly drew adverse inferences from his lack of medical treatment, the ALJ failed to develop the record on the issue of lack of medical treatment, the ALJ erred in finding that his daily activities diminish his testimony, and the ALJ's hypothetical question to the vocational expert did not contain all his limitations.  For the reasons discussed below, the undersigned concludes those contentions do not warrant reversal.

## I.    Substantial Evidence Supported the ALJ's Residual Functional Capacity Finding

Hightshoe argues the ALJ's residual functional capacity finding lacks substantial evidentiary support.  As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work."  20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4).  The claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  Assessing a claimant's RFC lies within the exclusive province of the ALJ.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017

WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Social Security Ruling 96-8p dictates that an RFC assessment must first determine the claimant's functional limitations and then address the claimant's ability to work on a function-by-function basis, pursuant to the functions described in paragraphs (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. SSR 96-8p, 1996 WL 374184, *1. The ALJ does not need to enumerate every piece of evidence or function used in his determination, but rather must simply portray that he considered the claimant's medical conditions in totality. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009). Once the ALJ has conducted that determination, the ALJ may then express the RFC in terms of exertional levels such as sedentary, light, medium, heavy, and very heavy. SSR 96-8p, 1996 WL 374184, at *1; *see Castel*, 355 F. App'x at 263; *Freeman v. Barnhart*, 220 F. App'x 957, 959 (11th Cir. 2007); *see also Bailey v. Astrue*, No. 5:11-CV-3583-LSC, 2013 WL 531075, *6 (N.D. Ala. Feb.11, 2013).

Hightshoe argues the ALJ improperly found he possessed the residual functional capacity to perform a limited range of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If

someone can do light work, we determine that he or she can also do
sedentary work, unless there are additional limiting factors such as loss of
fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 416.967(b).  Hightshoe contends that "[w]hile the ALJ summarized the

medical evidence, the RFC assessment is simply conclusory and does not contain any

rationale or reference to the supporting evidence, as required by SSR 96-8p." (Doc. 14

at 19).  He also asserts the ALJ "omitted any limitations caused by severe pain." (*Id.*).

The court finds that the ALJ's analysis in this case satisfied the requirements of

SSR 96-8p.  Hightshoe improperly characterized the ALJ's RFC finding as conclusory,

devoid of rationale and supporting evidence, and omitting any limitations resulting from

pain.  To the contrary, the ALJ described Hightshoe's medical records sufficiently and

adequately explained how Hightshoe's physical and mental conditions affected his

ability to work.  (Tr. 83-88).  Furthermore, the ALJ reported that he considered the

totality of the evidence in formulating the RFC:

> In making this finding, the undersigned has considered all symptoms and
> the extent to which these symptoms can reasonably be accepted as
> consistent with the objective medical evidence and other evidence, based
> on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p. The
> undersigned also considered the medical opinion(s) and prior
> administrative medical finding(s) in accordance with the requirements of
> 20 CFR 404.1520c and 416.920c. . . .

> As for the claimant's statements about the intensity, persistence, and
> limiting effects of his symptoms, they are inconsistent because, in light of
> the medical evidence of record in its totality and testimony at the hearings,
> the claimant's capabilities are reflected accurately in the residual functional
> capacity.

(Tr. 83, 84).  Moreover, substantial evidence in the record supports the ALJ's RFC

formulation.

As for Hightshoe's physical condition, the ALJ recounted that in April 2019 Hightshoe "presented to an emergency room complaining of neck pain" and exhibited "mild multilevel degenerative changes."  (Tr. 84-85, 438-40, 597).  However, "[a] cervical x-ray indicated no acute fracture or skeletal lesion, no malalignment and[,] no acute osseous abnormality."  (Tr. 84, 439).  In addition, a cervical MRI "indicated no abnormal signal in the spinal cord," "no acute fracture or suspicious osseous lesion," "no malalignment," and "no spinal stenosis or ocural foraminal encroachment."  (Tr. 85, 597).

"In July 2019, Jose Oblena, M.D., noted that [Hightshoe] was treated for hypertension related to anxiety" and "was described as having a panic attack."  (Tr. 85, 555).  Hightshoe's "blood pressure at presentation was 160/110 and [had] a heart rate of 105," but after Hightshoe "calmed own, his blood pressure dropped to 129/92 and a pulse of 75."  (*Id*.).  Furthermore, Hightshoe had "stopped taking his blood pressure medication in 2019" and "was noted to not be compliant with all his medication regimen."  (Tr. 85, 612-13).

Moreover, after Hightshoe "suffered a comminuted distal tibia fracture to his right leg" in December 2019, Hightshoe exhibited "minimal swelling" in February 2020. (Tr. 84, 574, 602).  In April 2020, Michael Wiedmer, M.D., observed Hightshoe "doing better and walking on it some with some noted swelling around the ankle."  (Tr. 84, 600).  Then, in July 2020, an x-ray of Hightshoe's "right tibia revealed the distal tibia

fracture was healed" and "Dr. Wiedmer noted that his right distal fracture was doing 'quite well.'" (Tr. 84, 634).

As for Hightshoe's mental condition, the ALJ cited a February 2019 record demonstrating Hightshoe "was noted to be doing 'better'," and "had a largely normal mental status exam." (Tr. 85, 491-96). In July 2020, Hightshoe claimed he suffered from depression, but his mental status exam revealed normal findings. (Tr. 85, 638-42, 645-51). In conclusion, the ALJ noted "that during the time period at issue, [Hightshoe] could drive and do chores – and there is no evidence of any functional limitations not accommodated by the residual functional capacity herein." (Tr. 85, 273-280).

Thus, the ALJ satisfied the requirements to assess Hightshoe's functional limitations, determine his ability to work on a function-by-function basis, and characterized his exertional abilities.[2]

Hightshoe also argues that the ALJ "acknowledged the report of Gloria Sellman, M.D., a State Agency physician," who reviewed his records, but the ALJ's finding "conflicts with the Commissioner's Medical Expert." (Doc. 14 at 2, 18). The court disagrees because both the ALJ and Dr. Sellman found that Hightshoe could perform a reduced range of light work, with the ALJ assessing a slightly more restrictive finding.

---

[2] Hightshoe tendered newly proffered medical evidence to the Appeals Council. (Tr. 2, 8-49, 60-74). After review, the Appeals Council did not exhibit that evidence because it did not show a reasonable probability of changing the outcome of the administrative decision. (Tr. 2). Hightshoe does not contest that conclusion. Accordingly, "when a claimant challenges the administrative law judge's decision to deny benefits, but not the decision of the Appeals Council to deny review of the administrative law judge, [the court] need not consider evidence submitted to the Appeals Council." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1266 (11th Cir. 2007).

The ALJ explained in his decision that

Gloria Sellman, M.D., a State Agency physician, reviewed the claimant's records in August 2019 and assessed him with less than a full range of light work ability . . . .  She thought the claimant could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl.  She thought the claimant should never climb ladders, ropes and scaffolds as a safety precaution [sic].  She thought the claimant could frequently balance.  She thought the claimant should avoid concentrated exposure to extreme cold, extreme heat, wetness, fumes, odors, dusts, gases, poor ventilation, etc.  She thought the claimant should avoid work at unprotected heights, work around large bodies of water, and work around hazardous fast moving machinery as a safety precaution.

(Tr. 85).

The ALJ then found

the August 2019 opinion of the non-examining State agency physician, Dr. Sellman, to be largely persuasive . . . .  Dr. Sellman, however, did not have the benefit of the additional evidence provided at the hearing level, including additional medical records.  Therefore, the undersigned has a different residual functional capacity in some limitations based upon independent review and analysis of the evidence at the hearing level.  According, her opinion is not based on the evidence in its entirety.  The undersigned has found that the medical evidence provided at the hearing level supports the claimant being more as outlined above, although both arrived at a reduced range of light work, which is consistent with the medical evidence of record and supported by the claimant's testimony and treatment. [sic]

(Tr. 86-87).

Therefore, as the Commissioner correctly points out the ALJ explained that he found Dr. Sellman's opinion largely persuasive and incorporated nearly identical limitations in the RFC, with the exception of the ALJ limiting Hightshoe to only occasional exposure to extreme temperatures, wetness, and pulmonary irritants, rather

than Dr. Sellman's less restrictive "concentrated exposure." *Cf. Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985) (holding that "taken alone" the opinions of non-examining physicians "do not constitute substantial evidence on which to base an administrative decision"), *superseded by regulation on other grounds*.

## II.   The ALJ Properly Evaluated Hightshoe's Subjective Pain Symptoms

Hightshoe argues that the ALJ's finding conflicts with his testimony as to his pain symptoms.  (Doc. 14 at 2, 20).

> A three-part "pain standard" applies when a claimant attempts to establish disability through her own testimony of pain or other subjective symptoms. [*Wilson* v. *Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002)]. The pain standard requires evidence of an underlying medical condition and either objective medical evidence that confirms the severity of the alleged pain arising from that condition or a showing that the objectively determined medical condition is of such severity that it can be reasonably expected to give rise to the alleged pain. *Id.*

*Porto v. Acting Comm'r of Soc. Sec. Admin.*, 851 F. App'x 142, 148 (11th Cir. 2021).  A claimant's testimony coupled with evidence that meets this standard suffice "to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted); *see also Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 752 (11th Cir. 2021).

Social Security Ruling ("SSR") 16-3p mandates the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file."  SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016).  An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety

of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4), 416.929(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." 2016 WL 1119029 at *9; *see also Wilson*, 284 F.3d at 1225 (If an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Hightshoe testified at the hearing that he had participated in therapy for six years at that time for depression and anxiety. (Tr. 101). He also discussed taking medications such as Prozac for his depression and anxiety, yet he declared they do not help. (Tr. 102, 107). Hightshoe explained his mental condition causes him to have difficulty getting along with coworkers, which then leads to him losing jobs. (Tr. 102-03). He also averred trouble with focusing when given multiple tasks. (Tr. 103-04). Hightshoe further mentioned that he rarely leaves his house, except to quickly go to a store or work, because he tries to avoid people. (Tr. 104-05). He stated that his depression causes him to have a lack of energy, appetite, sleep, and interests in doing anything. (Tr. 106-07). Hightshoe claimed he suffers anxiety when someone knocks at the door

unexpectedly or when his phone rings loudly.  (Tr. 107).

Hightshoe then attested that he suffered from a right leg fracture in December 2019.  (Tr. 108).  He initially used a wheelchair for three months to move around and then used a walker in addition to the wheelchair.  (Tr. 109-10).  At approximately six months, Hightshoe commenced using crutches.  (Tr. 110).  At the hearing, Hightshoe stated he stopped using the crutches, and he could walk for about a block, or stand on his feet for 20 minutes, before he begins to experience swelling and severe pain in his leg requiring him to sit and rest.  (Tr. 110-11).  His fracture also causes him problems with sitting unless he elevates his leg.  (Tr. 110).  Hightshoe rates his daily pain a seven out of ten.  (Tr. 112).  He claims he experiences worse pain when he walks and at night. (*Id.*).  Hightshoe alleges his pain has not improved at all.  (Tr. 111).

In his Function Report, Hightshoe stated he lives with his father, a stroke victim, and he helps with cooking, bathing, and medicating him.  (Tr. 273).  Hightshoe also wrote that he feeds his pets.  (Tr. 274).  He declared that he can no longer stand for long periods of time or lift objects.  (*Id.*).  Hightshoe claims his neck pain subsides when he does not move it, but he still experiences migraines which affect his sleep.  (*Id.*).  He chronicled he has no problem with his personal care, but his ability to personally care for himself depends on his pain level and depression.  (*Id.*).

Hightshoe reported using a microwave daily to prepare his own meals.  (Tr. 275). He also declared that he cleans, cooks, and launders clothes, albeit with neck pain.  (*Id.*). Furthermore, Hightshoe explains he does not do these things often, and he engages in

these activities based on the pain level in his neck and migraines.  (*Id.*).  He claimed his neck pain prevents him from going outside, but when he does, he drives a car for travel and cannot go out alone.  (Tr. 276).  Hightshoe recounted that he goes to the store about once a week for easy, fast things.  (*Id.*).  He has the ability to pays bills and count change, yet he cannot handle a savings account or use a checkbook/money orders because he stays "heavily medicated," easily forgets, and can go days without getting out of bed or talking to people due to his depression.  (*Id.*).

Hightshoe described that when he has migraines, he turns his lights off and lays in bed.  (Tr. 277).  He further elaborated he experiences pain with everything that he does so he attempts to complete activities quickly.  (*Id.*).  Hightshoe also does not spend time with others because his depression and anxiety cause him "to be antisocial" or have emotional outbursts.  (Tr. 278).  He claims he experiences to much pain to lift, squat, bend, or stand for a period of time.  (*Id.*).  Hightshoe explained he can walk but not without pain.  (*Id.*).

Hightshoe conveyed having trouble with his concentration and memory as well.  (*Id.*).  He clarified that he cannot pay attention for long periods because he sways off track easily, he does not finish activities he starts, and he easily confused by instructions.  (*Id.*).  Hightshoe stated he avoids authority figures as much as possible, and employers have fired him for not getting along with coworkers or for being emotional.  (Tr. 279).  He reported he cannot handle stress well, and he does not like changes in routines or sudden noises like a phone ring or door knock.  (*Id.*).

16

The ALJ found that Hightshoe's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms and functional limitations," but concluded Hightshoe's "statements concerning the intensity, persistence and limiting effects" of his impairments were not consistent with the objective medical evidence in the record. (Tr. 84).[3] Substantial evidence in the record supports the ALJ's findings.

Concerning Hightshoe's mental condition, on September 29, 2017, Highland Health Systems ("Highland") assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 515). He also manifested appropriate cognition, a euthymic mood, appropriate affect, appropriate behavior, intact memory, and appropriate speech. (*Id.*). Hightshoe did not appear to have deficits in orientation or intellect. (*Id.*). In addition, he mentioned looking for work and hoping to soon have a job. (*Id.*). On February 26, 2018, Highland assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 517). He also exhibited appropriate cognition, a euthymic mood,

---

[3] The ALJ did not explicitly reference Hightshoe's Function Report in his opinion. Nonetheless, the ALJ's opinion states he "considered all [of Hightshoe's] symptoms" based upon 20 C.F.R. 404.1529, 20 C.F.R. 416.929, and SSR 16-3p. (Tr. 83). In addition, "'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision is not a broad rejection which is not enough to enable a reviewing court to conclude the ALJ considered the claimant's medical condition as a whole." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal alterations and citation omitted). For the reasons discussed herein, the ALJ's opinion reasonably portrays he considered Hightshoe's condition as a whole. Accordingly, any error arising from the ALJ's failure to summarize Hightshoe's Function Report manifests harmlessly. *See Nance-Goble v. Saul*, No. 4:20-cv-00369-CLM, 2021 WL 2401178, at *3–5 (N.D. Ala. June 11, 2021) (finding the ALJ did not specifically mention the claimant's relevant hearing testimony but stated he considered "all [her] symptoms" based upon §§ 404.1529, 416.929, and thus, did not improperly omit reference to the claimant's testimony).

appropriate affect, appropriate behavior, intact memory, and appropriate speech. (*Id.*). Hightshoe did not appear to harbor deficits in orientation or intellect. (*Id.*). On February 21, 2019, Highland noted that Hightshoe reported feeling better and doing well. (Tr. 491).

On June 25, 2019, Behavioral Health chronicled that Hightshoe reported feeling anxious and experiencing decreased sleep. (Tr. 692). During a mental exam, Hightshoe appeared cooperative and alert, with normal speech rate and volume; a depressed and anxious mood; a congruent affect; a logical and goal directed thought process; an appropriate thought content; orientation to person, place, and date; intact attention/concentration; an intact memory; an average fund of knowledge; intact language; and fair insight and judgment. (Tr. 695-96).

On September 9, 2019, Behavioral Health documented that Hightshoe reported feeling better, but still experienced depression, anxiety, low energy, and low interests. (Tr. 685). During a mental exam, Hightshoe appeared cooperative and alert, with normal speech rate and volume; a depressed and anxious mood; an appropriate affect; a logical and goal directed thought process; an appropriate thought content; orientation to person, place, and date; intact attention/concentration; an intact memory; fair insight; and fair judgment. (Tr. 688-89).

On October 24, 2019, Behavioral Health noted that Hightshoe reported feeling depressed, anxious, and irritable. (Tr. 674). He claims he suffered from decreased sleep. (*Id.*). During a mental exam, Hightshoe appeared cooperative and alert, with normal

speech rate and volume; a depressed, anxious, and irritable mood; an appropriate affect; a logical and goal directed thought process; appropriate thought content; orientation to person, place, and date; intact attention/concentration; an intact memory; fair insight; and fair judgment. (Tr. 677-78).

On December 18, 2019, Behavioral Health assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 667). He also portrayed appropriate cognition, a dysphoric mood, a flat affect, appropriate behavior, intact memory, and appropriate speech. (*Id.*). Hightshoe did not appear to have deficits in orientation or intellect. (*Id.*).

On February 14, 2020, Behavioral Health assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 664). He also displayed appropriate cognition, a dysphoric mood, a flat affect, appropriate behavior, and appropriate speech. (*Id.*). Hightshoe did not appear to have deficits in orientation or intellect. (*Id.*).

On April 24, 2020, Behavioral Health found that Horton appeared cooperative and alert, with orientation to time, place, person, and situation; normal speech rate, rhythm, volume, and reaction time; an irritable and dysphoric mood; a blunt and flat affect; and a normal thought process. (Tr. 657). Hightshoe did not present with delusions, obsessions, compulsions, hallucinations, or suicidal/homicidal thoughts. (Tr. 657-58).

On May 20, 2020, Behavioral Health assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 653). He also exhibited appropriate cognition, affect,

behavior, and speech. (*Id.*). In addition, Hightshoe presented with a euthymic mood and intact memory. (*Id.*). He did not appear to lodge any deficits in orientation or intellect. (*Id.*).

On May 28, 2020, Behavioral Health reported that Hightshoe appeared cooperative and alert, with a normal speech rate and volume; depressed and anxious mood; congruent affect; a goal oriented thought process; appropriate thought content; orientation to person, date, and place; intact attention/concentration; intact memory; and fair insight and judgment. (Tr. 650-51).

On July 17, 2020, Behavioral Health assessed Hightshoe as being a low risk of danger to himself and others. (Tr. 645). He also demonstrated appropriate cognition and no deficiency in his orientation or intellect. (*Id.*). Hightshoe did, however, reflect a dysphoric mood, flat affect, and unclear speech. (*Id.*).

On July 30, 2020, Behavioral Health expressed that Hightshoe reported not doing too well, feeling down and isolated. (Tr. 638). Jorge Castro, Hightshoe's psychiatrist, noted that Hightshoe's symptoms included depressed mood and low energy. (*Id.*). Hightshoe also reported both normal and decreased sleep, but he maintained a normal appetite. (*Id.*). Castro's report identified Hightshoe's family as his stressor. (*Id.*). Outside of his self-reported complaints and symptoms, Hightshoe otherwise had a normal, unremarkable mental status exam. He cooperated, had a normal speech rate and volume, a congruent affect, a goal directed thought process, and appropriate thought content. (Tr. 641). In addition, Hightshoe seemed alert,

orientated to place, person, and date, and displayed fair insight and judgment. (Tr. 642). The report notes Hightshoe's medications as ineffective and shows a discontinuance of Remeron, and a prescription for Effexor and Melatonin. (Tr. 643). Otherwise, Castro continued Hightshoe's previous treatment plan and instructed Hightshoe to follow up in six weeks thereafter. (*Id*.).

As for Hightshoe's physical condition, on April 18, 2019, Regional Medical Center reported that Hightshoe presented with neck pain. (Tr. 432). Hightshoe received instruction that he could return to work in two days from his discharge date of April 18, 2019. (Tr. 433). Hightshoe also underwent an x-ray of his cervical spine which depicted mild discogenic degenerative changes at multiple levels, but it portrayed no acute osseous abnormality. (Tr. 439, 458).

On April 25, 2019, Quality of Life Health Services ("Quality of Life") remarked that Hightshoe presented with pain in his upper spinal column. (Tr. 521). It appeared that he experienced muscle spasms and severe pain with motion in his cervical spine. (Tr. 527). Hightshoe underwent another x-ray of his cervical spine which displayed mild degenerative disc disease at C5-C6 but no fracture or listhesis. (Tr. 528, 549). On June 12, 2019, Hightshoe presented with neck pain at Quality of Life. (Tr. 625). Specifically, Hightshoe experienced muscle spasms and pain when demonstrating the range of motion in his cervical spine. (Tr. 630). Hightshoe received an assessment of having radiculopathy in his cervical spine. (Tr. 631). On June 13, 2019, Hightshoe underwent an MRI of his cervical spine which portrayed mild degenerative changes in

C4-C5 and C5-C6 but no evidence of an acute fracture, focal soft disc extrusion, or central canal stenosis. (Tr. 597-598).

On June 23, 2019, Hightshoe presented with chest pain and hypertension at Regional Medical Center. (Tr. 586). Hightshoe underwent a chest x-ray which portrayed no acute chest findings. (Tr. 593). Regional Medical Center discharged Hightshoe in stable condition that same day, and his discharge paperwork stated he "should be able to return to work/school in 1 day(s)" from his discharge date. (Tr. 585-87). On July 1, 2019, Hightshoe presented with "severe hypertension related to anxiety" at Quality of Life, and after he calmed down, his blood pressure improved. (Tr. 555). Jose Oblena, M.D., believed that Hightshoe's "anxiety [was] a primary factor of his high blood pressure and heart rate." (*Id.*). During an office visit on June 16, 2020, Hightshoe stated he stopped taking his blood pressure medication because he took antidepressants. (Tr. 613). Odeane Connor, M.D., informed Hightshoe that he could take both medications and Hightshoe stated he would resume taking his blood pressure medication. (*Id.*).

On December 29, 2019, Hightshoe presented with a distal third tibia fracture in his right leg at Regional Medical Center. (Tr. 557). He then underwent an intramedullary nailing of his right tibia without difficulty and "was discharged home in stable condition" on December 31, 2019. (*Id.*). Throughout multiple visits Dr. Wiedmer stated that Hightshoe's fracture would heal between four and twelve months. (Tr. 600-04). On July 9, 2020, Dr. Wiedmer described Hightshoe's leg as "doing much

better," albeit "moderately swollen," and Hightshoe had walked on it while using a crutch sometimes. (Tr. 634). An x-ray revealed his tibia fracture healed and was "doing quite well." (*Id.*). Dr. Wiedmer again stated that "it takes about a year to get over this [and] that is why [Hightshoe is] still having pain and stiffness in the ankle with recommend[ed] walking and ambulation knowing it may take up to about a year to get up to speed." (*Id.*).

Though the longitudinal medical record demonstrates Hightshoe expressed and experienced depression, anxiety, hypertension, and neck and leg pain, it does not provide substantial evidentiary support for an RFC finding more restrictive than the measure the ALJ imposed.

Hightshoe also argues the ALJ erred in holding that his daily activities contradicted his pain allegations. (Doc. 14 at 23). The Commissioner may consider a claimant's daily activities when evaluating the credibility of the claimant's complaints of subjective symptoms. 20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(i). "Evidence of daily activities is a proper basis to discredit a claimant's testimony when [his or] her daily activities demonstrate a higher level of functioning than her alleged disabling symptoms would allow." *Love v. Colvin*, No. 6:15-CV-338-WMA, 2016 WL 741974, at *5 (N.D. Ala. Feb. 24, 2016) (citing *Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002)). "Numerous courts in this circuit have found that 'participation in everyday activities of short duration' does not disqualify a claimant from disability and have reversed ALJ decisions relying on such participation to discredit the claimant." *Id.* (quoting *Lewis v.*

*Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997)) (citations omitted).  "It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances."  *Id.* (internal quotation marks omitted) (citation omitted).

Even if Hightshoe's daily activities alone do not discount his subjective complaints of pain, they do support the ALJ's finding, in conjunction with the medical evidence reviewed previously, that he can perform a reduced range of light work.  As mentioned, Hightshoe declared he cares for his disabled father by preparing his breakfast, helping him bathe, and ensuring he takes his medications.  (Tr. 273). Hightshoe also cares for his pets and performs other household chores such as cleaning, cooking, and doing laundry.  (Tr. 274-75).  In addition, Hightshoe can drive and count change.  (Tr. 276).

Hightshoe also argues the ALJ drew adverse inferences from a lack of medical treatment "even though claimant explained that he had no income."  (Doc. 14 at 22). An ALJ cannot discredit a claimant's testimony as to the intensity or persistence of his or her pain solely based on the failure to obtain medical treatment he or she cannot afford:

> "[R]efusal to follow prescribed medical treatment without a good reason will preclude a finding of disability," and "poverty excuses noncompliance."  *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir.1988). Additionally, when an ALJ relies on noncompliance as the *sole* ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment,

the ALJ is required to determine whether the claimant was able to afford the prescribed treatment. *See id.* at 1214.

*Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) (emphasis added).

The court does not find the ALJ drew any inferences about Hightshoe's symptoms based upon a failure to obtain medical treatment. The ALJ mentions Hightshoe "stopped taking his blood pressure medication in 2019." (Tr. 85). However, the record portrays that Hightshoe ceased taking his hypertension medication out of concern that it may lead to a bad interaction with his antidepressants, not for financial reasons. (Tr. 613). In another instance, the ALJ mentions Hightshoe "was noted to not be compliant with all his medication regimens." (Tr. 85). At the hearing, Hightshoe's counsel explained that Hightshoe did not have insurance after September 30, 2019, (Tr. 102, 110, 112), and the record demonstrates that on May 20, 2020, and June 16, 2020, Hightshoe discussed not being able to afford his medication at that time, (Tr. 613, 653). However, the ALJ did not rely upon this evidence of medication noncompliance in rendering his assessment of Hightshoe's pain symptoms.

Furthermore, even if the ALJ's allusions to Hightshoe's medication noncompliance infers an adverse assessment of his pain symptoms, the ALJ did not rely solely on such noncompliance as a ground for denial of benefits. *Ellison*, 355 F.3d at 1275 ("This case is distinguishable from *Dawkins* because, unlike in *Dawkins*, the ALJ's determination that Ellison was not disabled was not significantly based on a

finding of noncompliance.").  As recounted, the ALJ largely relied upon the balance of the record for his determination.

Hightshoe also contends the ALJ failed to develop the record on the issue of medication noncompliance.  (Doc. 14 at 23).  "It is well-established that the ALJ has a basic duty to develop a full and fair record."  *Ellison*, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(d)) (stating that "[b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application"); *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995)).  "In evaluating the necessity for a remand, [courts] are guided by 'whether the record reveals evidentiary gaps which result in unfairness or "clear prejudice.""' *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (quoting *Smith v. Schweiker*, 677 F.2d 826, 830 (11th Cir. 1982)); *see also id.* at 935-36 ("The lack of medical and vocational documentation supporting an applicant's allegations of disability is undoubtedly prejudicial to a claim for benefits.").  "Nevertheless, the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim.  *Ellison*, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(a) (stating that "[claimant] must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s)"); 20 C.F.R. § 416.912(c) (stating "[y]our responsibility. You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say you are disabled")).

The record does not reveal an evidentiary gap that clearly prejudiced Hightshoe. As discussed, the ALJ did not draw any adverse inferences from Hightshoe's medication noncompliance, and even if such occurred, the ALJ did not rely solely or primarily upon such an inference in the pain assessment.

## III. The ALJ Properly Included All Supported Limitations in the Hypothetical Question to the Vocational Expert

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (internal quotation marks omitted) (quoting *Wilson*, 284 F.3d at 1227 (11th Cir. 2002) (per curiam)).   However, "'[t]he ALJ is not required to include findings in the hypothetical that the ALJ has found to be unsupported.'"   *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11th Cir. 2004)).

The ALJ's hypothetical question to the vocational expert mirrored his residual functional capacity finding.  (Tr. 83, 113-14).  Hightshoe asserts the question "was not based on a correct or full statement of claimant's mental and physical limitations and impairments."  (Doc. 14 at 25).  However, as previously stated, the mere presence of pain does not support a finding of disability, as the functional effects of the pain govern the analysis.  *See Moore,* 405 F.3d at 1213 n.6; *Mansfield v. Astrue*, 395 F. App'x 528, 531 (11th Cir. 2010); *Osborn v. Barnhart*, 194 F. App'x 654, 667 (11th Cir. 2006).

Furthermore, the ALJ's RFC finding included limitations to accommodate his symptoms and avoid exacerbating his condition, and substantial evidence supported that finding.   The court cannot discern from the record any limitations the ALJ could have included that would change the disability finding, other than those limitations the ALJ properly considered unsupported.   Accordingly, the court concludes the ALJ included all of Hightshoe's impairments in the hypothetical question to the vocational expert, and he properly relied on the vocational expert's testimony.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 16th day of March, 2023.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE